IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ENERGY FUTURE HOLDINGS CORP., et al.,<br><br>Debtors. | Chapter 11<br>Bankruptcy Case No. 14-10979-CSS<br>(Jointly Administered)<br><br>Bankruptcy Adv. No. 15-51917-CSS |
| MARATHON ASSET MANAGEMENT, LP, POLYGON CONVERTIBLE OPPORTUNITY MASTER FUND, POLYGON DISTRESSED OPPORTUNITIES MASTER FUND,<br><br>Appellants,<br><br>v.<br><br>ANGELO GORDON & CO, LP, APOLLO ADVISORS VII, L.P., BROOKFIELD ASSET MANAGEMENT PRIVATE INSTITUTIONAL CAPITAL ADVISOR (CANADA), L.P.,<br><br>Appellees. | Civil Action No. 16-287-RGA |

---

## MEMORANDUM OPINION

Adam G. Landis, Esq., Matthew B. McGuire, Esq., LANDIS RATH & COBB LLP, Wilmington, DE; George W. Shuster, Jr., Esq. (argued), Michael Guippone, Esq., WILMER CUTLER PICKERING HALE AND DORR LLP, New York, NY; Benjamin W. Loveland, Esq., WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, MA.

Attorneys for Appellants

Bradley R. Aronstam, Esq., Benjamin J. Schladweiler, Esq., ROSS ARONSTAM & MORITZ LLP, Wilmington, DE; George A. Davis, Esq., Jonathan Rosenberg, Esq., Peter Friedman, Esq. (argued), Daniel S. Shamah, Esq., Andrew Sorkin, Esq., O'MELVENY & MYERS LLP, New York, NY.

Attorneys for Appellees

March 28, 2017

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

This is an appeal from the Bankruptcy Court's April 12, 2016 Order granting Lender

Defendants' Motion to Dismiss Complaint and dismissing the adversary proceeding with

prejudice. The appeal is fully briefed. (D.I. 15; D.I. 17; D.I. 19). I held oral argument on

December 13, 2016. (D.I. 22 ("Tr.")). For the reasons set forth below, this Order is

**AFFIRMED**.

## I.   BACKGROUND

This appeals relates to the priority rights of two sets of lenders, both of which have lent

money to Texas Competitive Electric Holdings Company LLC ("TCEH") under a $24.5 billion

first lien credit facility. (D.I. 15 at p. 2). That facility had three distinct parts, $20.55 billion in

term loans, a $2.7 billion revolving line of credit, and a $1.25 billion deposit letter of credit

subfacility ("Deposit L/C Facility" or "Deposit L/C Loan") (collectively, the "Loans"). (*Id.* at p.

10). The Deposit L/C Lenders were the sole funding source of the Deposit L/C Facility, not all

lenders generally. (D.I. 15 at p. 2). Plaintiffs-Appellants are Marathon Asset Management, LP,

Polygon Convertible Opportunity Master Fund, and Polygon Distressed Opportunities Master

Fund ("Appellants"). Appellants, along with other lenders, constitute the Deposit L/C Lenders

who advanced all of the $1.25 billion in cash used to fund the Deposit L/C Facility. (D.I. 16 at

A1051). This money was deposited into a specific, segregated account (variously referred to as

"Deposit L/C Loan Collateral Account," "Deposit L/C Collateral," or "Deposit L/C Loan

Collateral"), and was not commingled with the proceeds of other lenders' loans or with TCEH's

other cash generally. (D.I. 15 at p. 2). Appellees are part of a class of other lenders which did

not lend into the Deposit L/C Loan Collateral Account. (D.I. 17 at 5). The $1.25 billion was

held as separate collateral for the Deposit L/C Facility. (D.I. 15 at p. 2). TCEH could request

that a bank ("Deposit L/C Issuer") issue deposit letters of credit to third parties with whom

TCEH might have business relationships requiring letters of credit to be posted. (*Id.* at p. 11).

There are three agreements relevant to this issue: the Credit Agreement (D.I. 16 at A843–

1049; D.I. 18 at SA1–277),[1] Intercreditor Agreement (*id.* at A733–91), and Security Agreement

(*id.* at A792–842) (collectively, the "Credit Documents"). The most relevant provision of the

Credit Documents is section 4.1 of the Intercreditor Agreement, which provides:

> 4.1 Application of Proceeds. Regardless of any Insolvency or Liquidation
> Proceeding which has been commenced by or against the Borrower or any other
> Loan Party, Collateral or any proceeds thereof received in connection with the
> sale or other disposition of, or collection on, such Collateral upon the exercise of
> remedies under the Security Documents by the Collateral Agent shall be applied
> in the following order (it being agreed that the Collateral Agent shall apply such
> amounts in the following order as promptly as is reasonably practicable after the
> receipt thereof; provided that such amounts shall not be so applied until such time
> as the amount of the Secured Obligations has been determined in accordance with
> the terms hereof and under the terms of the relevant Financing Document,
> including and subject to Sections 4.3 and 4.4 below)
>
> (a) with respect to all Collateral other than Deposit L/C Collateral:
>
>> first, on a pro rata basis, to the payment of all amounts due to the
>> Collateral Agent, any Agent, and the Issuing Lenders (in such capacities)
>> (other than amounts constituting Interest Expenses) under any of the
>> Financing Documents, excluding in the case of the Issuing Lenders,
>> amounts payable in connection with any unreimbursed amount under any
>> Letter of Credit;
>>
>> second, on a pro rata basis to any Secured Party which has theretofore
>> advanced or paid any fees to any Agent or Issuing Lender, other than any
>> amounts covered by priority first, an amount equal to the amount thereof
>> so advanced or paid by such Secured Party and for which such Secured
>> Party has not been previously reimbursed;

---

[1] The parties appear to agree that D.I. 18 at SA1-277 is the operative Credit Agreement (the "Credit Agreement as Amended"). (*See* D.I. 17 at 9 n.2; D.I. 19 at pp. 21–22). Because of this and the fact that this appears to be true from the four corners of the Credit Agreement as Amended, I treat the Credit Agreement as Amended as the operative Credit Agreement. For the purposes of this analysis, I generally rely on language in the original Credit Agreement located at D.I. 16 at A843–1039 because the difference between the original Credit Agreement and the Credit Agreement as Amended is immaterial for the most part and the parties largely rely on language in the original Credit Agreement. This only notable exception to this is in my discussion of Section 3.9, where I rely on language in the Credit Agreement as Amended.

third, on a pro rata basis, to the payment of, without duplication, (a) all principal and other amounts then due and payable in respect of the Secured Obligations (including Cash Collateralization of all outstanding Revolving Letters of Credit as required under the Credit Agreement or any other applicable Financing Document) and (b) the payment of Permitted Secured Hedge Amounts then due and payable to any Secured Commodity Hedge Counterparty under any Secured Commodity Hedge and Power Sales Agreement; and

last, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full in cash, to the Loan Parties or as otherwise required by applicable law.

(b) with respect to Deposit L/C Collateral:

first, on a pro rata basis, to the payment of all amounts due to the Deposit Letter of Credit Issuer under any of the Financing Documents, excluding amounts payable in connection with any unreimbursed amount under any Letter of Credit;

second, on a pro rata basis, to the payment of all amounts due to the Deposit Letter of Credit Issuer in an amount equal to *100% of the Unpaid Drawings under any Deposit Letter of Credit*;

third, on a pro rata basis, to any Secured Party which has theretofore advanced or paid any fees to the Deposit Letter of Credit Issuer, other than any amounts covered by priority second, an amount equal to the amount thereof so advanced or paid by such Secured Party and for which such Secured Party has not been previously reimbursed;

*fourth, on a pro rata basis, to the payment of all other Deposit L/C Obligations*; and

last, the balance, if any, after all of the Deposit L/C Obligations have been indefeasibly paid in full in cash, as set forth above in Section 4.1(a).

(Intercreditor Agreement § 4.1) (emphases added). Section 4.1 thus contains two "waterfalls," or

sets of rules governing the distributions of the Secured Parties' collateral or collateral proceeds.

Section 4.1(b) will be referred to as the "Section 4.1(b) Waterfall." It applies only to the Deposit

L/C Collateral. Section 4.1(a) applies to all other collateral.

///

4

## II.   LEGAL STANDARDS

### A. Standard of Review

The Court has jurisdiction to hear an appeal from a final judgment of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). On appeal from an order issued by the Bankruptcy Court, the Court "review[s] the bankruptcy court's legal determinations *de novo*, its factual findings for clear error and its exercise of discretion for abuse thereof." *In re Trans World Airlines, Inc.*, 145 F.3d 124, 131 (3d Cir. 1998). Abuse of discretion is found where a "court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Mack Trucks, Inc.*, 820 F.2d 91, 95 (3d Cir. 1987). Since the matter being reviewed here is a motion to dismiss, review is *de novo*.

### B. Motion to Dismiss

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). I am "not required to credit bald assertions or legal conclusions improperly

alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A complaint may not be dismissed, however, "for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014).

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 347. That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the [complainant] pleads factual content that allows the court to draw the reasonable inference that the [defendant] is liable for the misconduct alleged." *Id.* Deciding whether a claim is plausible will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *Id.* (emphasis removed).

### C. Contract Interpretation

This case is subject to New York's substantive law of contracts. (*See* Intercreditor Agreement § 9.10). "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide. Where the agreement is unambiguous, a court may not admit extrinsic evidence and interprets the plain language of the agreement as a matter of law." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 328 (S.D.N.Y. 2010). "On a motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in Plaintiffs' favor." *Id.*

"However, 'when the language of a contract is ambiguous, its construction presents a question of fact,' which of course precludes summary dismissal." *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 226 (S.D.N.Y. 2005).

"[T]he mere fact that the Parties disagree on the proper interpretation of the contract does not render the contractual language ambiguous." *Serdarevic*, 760 F. Supp. 2d at 329. "Contract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Id.* "[A] term is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Prior v. Innovative Commc'ns Corp.*, 207 F. App'x 158, 163 (3d Cir. 2006) (interpreting New York law). "A contract's ambiguity is a matter of law that we review *de novo*." *Id.*

"Under New York law, written agreements are construed in accordance with the parties' intent and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'" *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013). "Words and phrases used in an agreement must be given their plain meaning . . . ." *Bianco v. Bianco*, 830 N.Y.S.2d 21, 23 (App. Div. 2007). "The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956). "Even if there was an inconsistency between a specific provision and a general provision of a contract . . . the specific provision controls." *Id.*

///

7

## III.   DISCUSSION

### A. Conditions Precedent

The Bankruptcy Court determined that there are four conditions precedent to the application of either waterfall:

> (i) Collateral or any proceeds of Collateral are to be distributed to the First Lien Creditors;
>
> (ii) the Collateral must be 'received' by the Collateral Agent;
>
> (iii) the Collateral or the proceeds of Collateral must have resulted from a sale or other disposition of, or collection on, such Collateral; and
>
> (iv) the sale, disposition, or collection must have resulted from the exercise of remedies under the Securities Documents.

(D.I. 16 at A1303).   The Bankruptcy Court further determined that if these conditions precedent are not met, then "Plan Distributions would be distributed outside of the Intercreditor Agreement (i.e.[,] pursuant to the terms of the Bankruptcy Code, orders of this Court, and the Plan)." (*Id.*). The Bankruptcy Court found the Section 4.1(b) Waterfall inapplicable to the case at hand because the court found three of the four conditions precedent not met. (*Id.* at A1304–05). For the reasons requested by the parties, I do not address the issue as to whether the Bankruptcy Court's determination as to conditions precedent constitute error. (*See* Tr. 10:20–11:2, 11:5–12, 12:18–13:7, 13:14–14:6, 14:15–21)).

### B. Customs and Usages Evidence

New York's contract law sets up essentially two stages of analysis.   In the first stage, the court asks, based on the intrinsic record, whether the language is ambiguous.   If it is unambiguous, that is the end of the matter.   Only if it is ambiguous, does the court move to the second stage, where the court could consider extrinsic evidence.   At the motion to dismiss stage, if the language is ambiguous, summary dismissal is improper. *See Bank of Am. Corp.*, 385 F. Supp. 2d at 226.

8

As to the role of customs and usages during the first stage, the question of whether language is ambiguous must be viewed through the lens of one knowledgeable of the customs and usages of the relevant field. Under New York contract law, at this stage, evidence of who this person is and what this person knows, must be derived only from the intrinsic record. *See, e.g.*, *Serdarevic*, 760 F. Supp. 2d at 328; *W. Union Tel. Co. v. Am. Commc'ns Ass'n, C.I.O.*, 86 N.E.2d 162, 166 (N.Y. 1949) ("Evidence of custom is permitted for the purpose of qualifying the meaning of a contract where otherwise ambiguous and of providing for incidents not in contradiction of the fundamental provisions of the contract and of supplying omissions under certain circumstances which have occurred in the agreement of the parties. Evidence of it is not permitted for the purpose of contradicting the agreements which the parties have made or for the purpose of accomplishing an unfair or immoral construction of their contract."); *Cable-Wiedemer, Inc. v. Friederich & Sons Co.*, 336 N.Y.S.2d 139, 141 (Co. Ct. 1972) ("There is no reason to resort to trade practices or evidence of custom for an interpretation when the contract is unambiguous."); *Summer Commc'ns, Inc. v. Three A's Holding, LLC*, 175 F.3d 1008 (2d Cir. 1999) ("To be sure, a court need not consider trade practices or evidence of custom when, as here, the contract is unambiguous."); *N. Unit Potato Co. v. Spada Distrib. Co.*, 490 P.2d 995, 998 (Or. 1971) ("Evidence of custom cannot be used to contradict the terms of a written contract."); *Venturi, Inc. v. Adkisson*, 552 S.W.2d 643, 644 (Ark. 1977) ("Of course, evidence of custom and usage would not be admissible to vary, contradict or defeat the terms of the contract."). Thus, under New York law, only at the second stage can extrinsic customs and usages evidence be considered.

It is not entirely clear what Appellants are arguing with respect to customs and usages. (*See* D.I. 15 at 19–22). To the extent that Appellants are arguing that the Bankruptcy Court failed to consider extrinsic customs and usages evidence during the first stage of contract

interpretation, that argument fails because such evidence cannot be considered at that stage. To the extent that Appellants are arguing that the Bankruptcy Court failed to consider extrinsic customs and usages evidence during the second stage of contract interpretation, that argument puts the cart before the horse. As discussed in Part III.C, the Bankruptcy Court correctly determined the contract language was unambiguous and thus, such evidence was properly not considered.

To the extent that Appellants are arguing that their extrinsic customs and usages evidence is intrinsic customs and usages evidence and thus the evidence should have been considered during the initial stage (*see* Tr. 20:18–21:9; D.I. 19 at p. 11 n.7), this argument also fails. Appellants proffer "(a) comparable credit documents for other issuers that also include letter of credit subfacilities and corresponding cash collateral accounts, (b) market information showing the relative differences in the trading activity and pricing of Deposit L/C [] Facility positions and other [l]oan positions under the Credit Documents, (c) expectations among investors regarding letter of credit subfacilities of the type at issue here, and (d) . . . the drafting history of the Credit Documents." (D.I. 15 at p. 23 n.6). This appears to be classic extrinsic evidence because it does not appear that this information could be gleaned from the four corners of the Credit Documents. *See W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."). Because the four corners of the Credit Documents are unambiguous and support Appellees' interpretation, as discussed in Part III.C, such proffered evidence cannot be considered. The Bankruptcy Court correctly declined to consider extrinsic evidence. (D.I. 16 at A1300).

To the extent that Appellants argue that the Bankruptcy Court failed to arrive at the conclusion that the Credit Documents are ambiguous in light of the intrinsic customs and usages evidence, this argument fails. As discussed in Part III.C, the Bankruptcy Court arrived at the proper conclusion that the Credit Documents are unambiguous.

### C. Whether Priority Is Given to the Deposit L/C Lenders

The parties dispute whether the Credit Documents are ambiguous as to the interpretation of the term "Deposit L/C Obligations" within the phrase "fourth, on a pro rata basis, to the payment of all other Deposit L/C Obligations" (the "fourth priority") of the Section 4.1(b) Waterfall. The Bankruptcy Court held that the Credit Documents unambiguously do not provide the Deposit L/C Lenders priority to certain funds within the Deposit L/C Loan Collateral Account.

Appellants interpret the fourth priority of the Section 4.1(b) Waterfall to designate Deposit L/C Lenders (i.e., Appellants) as payees with a priority right to certain funds of the Deposit L/C Collateral. Appellees and the Bankruptcy Court interpret that language not to confer to Deposit L/C Lenders such a priority right. Appellants argue that it is ambiguous as to which of Appellants' or Appellees' interpretations prevails. Appellees argue, and the Bankruptcy Court found, that it is unambiguous that the Appellees' interpretation prevails.

The Credit Documents must be reviewed in light of one cognizant of the customs, practices, usages, and terminology of the relevant field. *See Prior v. Innovative Commc'ns Corp.*, 207 F. App'x 158, 163 (3d Cir. 2006). It is plausible to infer from the complaint and the Credit Documents, that this person would be a letter of credit subfacility lender or one well-versed in the field of letter of credit subfacility lending. *See Twombly*, 550 U.S. at 558 (noting

that one must "accept[] the well-pleaded allegations in the complaint as true and view[] them in the light most favorable to the complainant").

As a caveat, this opinion addresses the parties' most salient arguments. There are various other arguments and references to other provisions in the Credit Documents that both parties make, none of which materially alters the outcome of my decision.

### 1. Mechanics of the Section 4.1(b) Waterfall

The relevant part of section 1.1 of the Credit Agreement defines "Deposit L/C Obligations" as:

> [A]t any date of determination, the aggregate Stated Amount of all outstanding Deposit Letters of Credit plus the aggregate principal amount of *all Unpaid Drawings under all Deposit Letters of Credit*.

(Credit Agreement § 1.1) (emphasis added).[2] Again the relevant language of the fourth priority of the Section 4.1(b) Waterfall provides: "fourth, on a pro rata basis, to the payment of all other Deposit L/C Obligations." (Intercreditor Agreement § 4.1(b)). The language of the fourth priority language, on its face, does not appear to involve any payments to the Deposit L/C Lenders.

Appellants argue that based on the definition of Deposit L/C Obligations, the value of the Deposit L/C Obligations is the sum total of (a) the dollar amount of outstanding undrawn deposit letters of credit and (b) the dollar amount of drawn deposit letters of credit. (D.I. 15 at 32). The maximum amount the Deposit L/C Obligations could total is $1.25 billion dollars, which is the amount that lenders placed into the Deposit L/C Facility. (Tr. 46:22–25). Thus, Appellants say that it is reasonable that, in addition to the Deposit L/C Issuers,[3] Deposit L/C Lenders (i.e.,

---

[2] This language in the Credit Agreement is relevant here. (*See* Intercreditor Agreement § 1.2).

[3] From here through Part III.C.9, Deposit L/C Issuers is used in this analysis loosely to refer to recipients of payment under the first three priorities of the Section 4.1(b) Waterfall.

Appellants) serve as obligees to the Deposit L/C Obligations.  (D.I. 15 at 32–33).  Appellants explain that the first component, the dollar amount of undrawn deposit letters of credit, cannot be owing to the Deposit L/C Issuer at that time because, by definition, no drawings under those undrawn deposit letters of credit have occurred.  For the second component, "all Unpaid Drawings under all Deposit Letters of Credit," they argue that it is identical to "100% of the Unpaid Drawings under any Deposit Letter of Credit," which is the amount paid to the Deposit L/C Issuer under the second priority of the Section 4.1(b) Waterfall.  Appellants argue that by the time the fourth priority is reached, the Deposit L/C Issuer must have already been paid all amounts then owing to it.  To avoid rendering the fourth priority redundant, they say the Deposit L/C Lenders must be the payees of the Deposit L/C Obligations.  (D.I. 15 at 48–49).[4]

Appellees counter that the Credit Agreement specifically defines Deposit L/C Obligations to encompass the sum of TCEH's obligations, both fixed and contingent, only on account of all issued deposit letters of credit, whether drawn or undrawn.  In other words, the amount of "Deposit L/C Obligations" represents the total amount that TCEH could owe at any given time to the Deposit L/C Issuers on account of outstanding deposit letters of credit.  This is an amount that will necessarily fluctuate as deposit letters of credit are issued, drawn, terminated, and reimbursed.  They argue that this amount is entirely unconnected to TCEH's obligations to the Deposit L/C Lenders.  (D.I. 17 at pp. 26–27).  They further explain that the definition of "Deposit L/C Obligations" creates a formula that produces a dollar amount that corresponds to the face amount of issued deposit letters of credit at any given time, which the complaint concedes has always been less than the amount of the Deposit L/C Loans.  (D.I. 16 at A1065 ¶ 43).  Thus, they argue that Appellants' claim is "nonsensical" because Appellants' claim is only

---

[4] For a more detailed explanation of the sum to which Appellants lay a claim of priority, see D.I. 16 at A1062–65.

to undrawn amounts under issued deposit letters of credit, and not to funds in the Deposit L/C Collateral Account that are not needed for credit support for the Deposit L/C Issuers. (D.I. 17 at pp. 26–27). They argue that it is logical that the fourth priority covers contingent Deposit L/C Obligations that may be owed in the future to Deposit L/C Issuers. Once current, fixed obligations addressed in the earlier priorities are satisfied, remaining Deposit L/C Collateral is set aside to the extent necessary to satisfy TCEH's future contingent obligations to Deposit L/C Issuers for issued but undrawn deposit letters of credit. (D.I. 17 at pp. 31–32).

Appellants assert that the fourth priority cannot cover contingent obligations because the preamble to section 4.1 states the waterfall shall not be applied until "the amount of the Secured Obligations has been determined." (D.I. 15 at 50 n.14).

Appellees argue Appellants' assertion requires a predicate that finds no support in the Intercreditor Agreement: that the Secured Obligations can only be determined if they are fixed and non-contingent. Appellees point to the Intercreditor Agreement's definition of "Secured Obligations."[5] (D.I. 16 at A748). Appellees further argue that the fourth priority acts as a

---

[5] "Secured Obligations" is defined as:

> [C]ollectively, (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, Posting Advance or Letter of Credit or under any Secured Cash Management Agreement, Secured Commodity Hedge and Power Sales Agreement or Secured Hedging Agreement, in each case, entered into with US Holdings, the Borrower or any other Restricted Subsidiary of the Borrower, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding. Without limiting the generality of the foregoing, the Secured Obligations of the Loan Parties under the Loan Documents include the obligation (including guarantee obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Loan Party under any Loan Document and (b) all obligations of every nature outstanding under any Additional Obligations, whether fixed or contingent, matured or unmatured, in each case whether or not allowed or allowable in an Insolvency or Liquidation Proceeding. "Secured Obligations" shall include, without limitation, interest accruing at the then applicable rate provided in the applicable Financing Document after the maturity of the relevant Secured Obligations and any Post-Petition Interest.

(Intercreditor Agreement § 1.1).

14

"catch-all" provision to fully protect the Deposit L/C Issuers before the funds are paid to other

Secured Parties. Appellees note that this provision mirrors a parallel "catch-all" provision in the

section 4.1(a) waterfall. (*Id.* at pp. 34–35). The Bankruptcy Court's analysis is substantially

similar to Appellees' argument. (D.I. 16 at A1308–12).

These arguments lay the foundation for contextualizing arguments related to section 3.9

of the Credit Agreement, which I discuss below.

### 2. Section 3.9 of the Credit Agreement

The "smoking-gun" for understanding the meaning of "Deposit L/C Obligations" lies

with understanding how the term is used in section 3.9 of the Credit Agreement as Amended,

which provides:

> On the Closing Date, the Borrower established the Citibank Deposit L/C Loan
> Collateral Account for the purpose of cash collateralizing the Borrower's
> obligations to the Deposit Letter of Credit Issuer in respect of the Deposit Letters
> of Credit. On the Closing Date, the proceeds of the Deposit L/C Loans, together
> with other funds (if any) provided by the Borrower, were deposited into the
> Citibank Deposit L/C Loan Collateral Account such that the Deposit L/C Loan
> Collateral Account Balance equaled at least the Deposit Letters of Credit
> Outstanding. After the Amendment No. 2 Effective Date, the Borrower may
> establish additional Deposit L/C Loan Collateral Accounts for the purpose of cash
> collateralizing the Borrower's obligations to any Deposit Letter of Credit Issuer,
> and may transfer all or any portion of the funds in any Deposit L/C Loan
> Collateral Account to any other Deposit L/C Loan Collateral Account, subject to
> the satisfaction of the conditions set forth in this Section 3.9. The Borrower agrees
> that at all times, and shall immediately cause additional funds to be deposited and
> held in the Deposit L/C Loan Collateral Accounts from time to time in order that,
> (A) the Deposit L/C Loan Collateral Account Balance shall at least equal the
> Deposit Letters of Credit Outstanding and (B) the aggregate amount on deposit in
> the Citibank Deposit L/C Loan Collateral Account shall at least equal the Deposit
> Letters of Credit Outstanding in respect of all Citibank Deposit Letters of Credit.
> The Borrower hereby grants to the Collateral Agent, for the **benefit of all Deposit
> Letter of Credit Issuers**, a security interest in the Deposit L/C Loan Collateral
> Accounts and all cash and balances therein and all proceeds of the foregoing, as
> security for the Deposit L/C Obligations (**and, in addition, grants a security
> interest therein, for the benefit of the Secured Parties as collateral security
> for the Obligations; provided that (x) amounts on deposit in the Citibank
> Deposit L/C Loan Collateral Account shall be applied, first, to repay the**

15

**Deposit L/C Obligations in respect of Citibank Deposit Letters of Credit, second, to repay the Deposit L/C Obligations in respect of all other Deposit Letters of Credit and, then, to repay all other Obligations and (y) amounts on deposit in any other Deposit L/C Loan Collateral Account shall be applied, first, to repay the corresponding Deposit L/C Obligations, second, to repay the Deposit L/C Obligations in respect of all other Deposit Letters of Credit and, then, to repay all other Obligations**). Except as expressly provided herein or in any other Credit Document, no Person shall have the right to make any withdrawal from any Deposit L/C Loan Collateral Account or to exercise any right or power with respect thereto; provided that at any time the Borrower shall fail to reimburse any Deposit Letter of Credit Issuer for any Unpaid Drawing in accordance with Section 3.4(a), the Borrower hereby absolutely, unconditionally and irrevocably agrees that the Collateral Agent shall be entitled to instruct the applicable depository bank (each, a "Depositary Bank") of the applicable Deposit L/C Loan Collateral Account to withdraw therefrom and pay to the Administrative Agent for account of such Deposit Letter of Credit Issuer amounts equal to such Unpaid Drawings. Amounts in the Citibank Deposit L/C Loan Collateral Account shall be invested by the applicable Depositary Bank in Permitted Investments and, prior to the 2014 Deposit L/C Loan Maturity Date, in the manner as instructed by the Citibank, N.A. and, on and after the 2014 Deposit L/C Loan Maturity Date, in the manner instructed by the Borrower (and agreed to by such Depositary Bank). Amounts in any other Deposit L/C Loan Account, other than the Citibank Deposit L/C Loan Collateral Account, shall be invested by the applicable Depositary Bank in the manner instructed by the Borrower (and agreed to by such Depositary Bank). Prior to the 2014 Deposit L/C Loan Maturity Date and to the extent amounts in the Citibank Deposit L/C Loan Collateral Account are invested in anything other than Deposit L/C Permitted Investments, Citibank, N.A. shall bear the risk of loss of principal with respect to any such investments. The Borrower shall bear the risk of loss of principal with respect any other investments in any Deposit L/C Collateral Account. So long as no Event of Default shall have occurred and be continuing, upon at least three Business Days' prior written notice to the Collateral Agent and the Administrative Agent, the Borrower may, at any time and from time to time, request release of and payment to the Borrower of (and the Collateral Agent hereby agrees to instruct the applicable Depositary Bank to release and pay to the Borrower) any amounts on deposit in the Deposit L/C Loan Collateral Accounts in excess of the Deposit Letter of Credit Commitment (reduced by the aggregate amounts withdrawn by the Deposit Letter of Credit Issuer and not subsequently deposited by the Borrower), (provided that the Collateral Agent shall have received prior confirmation of the amount of such excess from the Administrative Agent). **In addition, the Collateral Agent hereby agrees to instruct the Depositary Bank to release and pay to the Borrower amounts (if any) remaining on deposit in the Deposit L/C Loan Collateral Accounts after the termination or cancellation of all Deposit Letters of Credit and the repayment in full of all outstanding Deposit L/C Loans and Deposit L/C Obligations.**

(D.I. 18 at pp. SA157–58) (emphases modified).

Appellants argue that section 3.9 of the Credit Agreement mandates priority of payment without specifying the intended payee. (D.I. 15 at 38–39). The Bankruptcy Court noted that the phrase "for the benefit of the Deposit Letter of Credit Issuer" in the original version of section 3.9 suggests otherwise. (D.I. 16 at A1317–18). Appellants respond to this observation by the Bankruptcy Court by pointing to the language in the original version of section 3.9 "and, in addition, grants a security interest therein, for the benefit of the Secured Parties as collateral security for the Obligations," and suggesting that the Deposit L/C Issuer has one lien and the Deposit L/C Loan Collateral Account does not preclude a second lien on the same account favoring the Deposit L/C Lenders and other Secured Parties. They argue it is apparent that both liens exist in tandem. Appellants further argue that the language cited by the Bankruptcy Court is lien priority language and not payment priority language. (D.I. 15 at 43–44).

Appellees point to language in the amended version of section 3.9 that suggests requiring repayment of Deposit L/C Obligations "in respect of all other Deposit Letters of Credit" before repayment of all other Obligations, without delineating between Obligations on account of Deposit L/C Loans and any other loans. Appellees further point to the last sentence which refers to the "repayment in full of all outstanding Deposit L/C Loans and Deposit L/C Obligations," which confirms, they argue, that the Deposit L/C Loans and Deposit L/C Obligations represent separate and distinct obligations. (D.I. 17 at pp. 36–38). The Bankruptcy Court essentially agreed with Appellees' argument. (D.I. 16 at A1312–13, A1317–18).

Appellees' argument is close to the mark. The key passage is the following:

provided that
> (x) amounts on deposit in the Citibank Deposit L/C Loan Collateral Account shall be applied,

> first, to repay the Deposit L/C Obligations in respect of Citibank Deposit
> Letters of Credit,
> second, to repay the Deposit L/C Obligations in respect of all other
> Deposit Letters of Credit and, then,
> to repay all other Obligations and
>
> (y) amounts on deposit in any other Deposit L/C Loan Collateral Account shall be
> applied,
> first, to repay the corresponding Deposit L/C Obligations,
> second, to repay the Deposit L/C Obligations in respect of all other
> Deposit Letters of Credit and, then,
> to repay all other Obligations

(D.I. 18 at SA157) (reformatted for clarity).  In this passage, the term "Deposit L/C Obligations"

is used four times.  Amounts on deposit in the Citibank Deposit L/C Loan Collateral Account are

distributed in the following order: (1) to Deposit L/C Obligations associated with Citibank's

Deposit Letters of Credit, (2) to Deposit L/C Obligations associated with all other Deposit L/C

Issuers, and (3) to "Obligations," that is, every other relevant entity.  Amounts in deposit in any

other Deposit L/C Loan Collateral Account are distributed in a similar arrangement: (1) to repay

corresponding Deposit L/C Obligations (which when read in parallel with (x), suggests would be

non-Citibank Deposit Letters of Credit), (2) to repay Deposit L/C Obligations in respect of all

other Deposit Letters of Credit (which when read in parallel with (x), suggests that this opens the

door to Citibank Deposit Letters of Credit), and (3) to "Obligations," or, again, every other

relevant entity.[6]

 The Deposit L/C Issuers are the clear and the only payees under the first and second steps

of (x) and (y).  The structure of this passage clearly leaves out Deposit L/C Lenders as payees

under the first and second steps of (x) and (y).  This language is written so narrowly that there is

---

[6] Appellants assert that the Citibank Deposit L/C Loan Collateral Account was the only Deposit L/C Loan Collateral
Account in existence.  (D.I. 15 at 19 n.2; D.I. 19 at p. 22 n.14).  I accept this assertion for present purposes.
Nevertheless, it is relevant and critical to look to the contract language as a whole.

no room for the Deposit L/C Lenders under either the first or second steps of (x) or (y). The only place left for Deposit L/C Lenders is under the third steps of (x) and (y).

The way this passage is structured alone clearly contemplates that Deposit L/C Issuers are the only payee associated with Deposit L/C Obligations. This is because payment is set up in a way that it is clear that the obligees of Deposit L/C Obligations are distinguished from obligees of "all other Obligations." It is clear from this language that the terms "Deposit L/C Obligations" and "all other Obligations" are mutually exclusive.

Obligees of Deposit L/C Obligations are taken care of in the first or second steps of (x) and (y). These can only be Deposit L/C Issuers. Everyone else who is relevant are obligees of "all other Obligations," and they are taken care of in the last steps of (x) and (y). Thus, logically, Deposit L/C Lenders can only be taken care of in the third and last steps. Thus Deposit L/C Lenders are the payees of "all other Obligations" and not of "Deposit L/C Obligations." To hold otherwise would illogically conflate Deposit L/C Lenders with Deposit L/C Issuers. The two are clearly different. The Deposit L/C Lenders loaned money into the Deposit L/C Facility. The Deposit L/C Issuers manage and issue deposit letters of credit associated with the Deposit L/C Collateral Accounts. Appellants' attempt to cut the line and essentially seek a payout under the first or second steps of (x) and (y) must fail.

The language that the purpose of Deposit L/C Collateral Accounts is to "cash collateraliz[e] the Borrower's obligations to the Deposit Letter of Credit Issuer in respect of the Deposit Letters of Credit" reinforces that the reading that Deposit L/C Obligations are only associated with Deposit L/C Issuers. (D.I. 18 at pp. SA157).

The following language also reinforces this reading:

> In addition, the Collateral Agent hereby agrees to instruct the Depositary Bank to
> release and pay to the Borrower amounts (if any) remaining on deposit in the

19

Deposit L/C Loan Collateral Accounts after the termination or cancellation of all
· Deposit Letters of Credit and the repayment in full of all outstanding Deposit L/C
Loans and Deposit L/C Obligations.

(D.I. 18 at SA157). What this language shows is that there is a clear distinction between payees

associated with Deposit L/C Obligations from those associated with Deposit L/C Loans. For this

distinction to be meaningful, the payees of Deposit L/C Obligations must be Deposit L/C Issuers

and the payees of Deposit L/C Loans must be Deposit L/C Lenders.

With this discussion of section 3.9 in mind, I turn back to the mechanics of the Section

4.1(b) Waterfall. I read the mechanics of the Section 4.1(b) Waterfall to parallel the mechanics

of section 3.9.[7] The bottom line is that the Deposit L/C Lenders are paid after the Deposit L/C

Issuers are paid, and the Deposit L/C Lenders are paid alongside any other relevant entity under

the fifth priority.

My reading is reinforced by strange results of Appellants' theory; Appellants claim

priority only to the undrawn amounts of issued deposit letters of credit. Their claim to priority is

not directly tied to the actual amount that they loaned into the Deposit L/C Facility. While I am

not sure that this is as Appellees call it, a "nonsensical" argument, Appellants' argument does

have an odd flavor to it. Under Appellants' reading, they would have no priority to funds in the

Deposit L/C Collateral Account that do not support issued letters of credit, but they would have

priority over funds needed to provide credit support for Deposit L/C Issuers.

Whatever amounts are left in the Deposit L/C Collateral Accounts by the time the fourth

level is reached, those are owed only to Deposit L/C Issuers and not to Deposit L/C Lenders.

Appellants argue that this would render the time the fourth priority redundant. They therefore

argue that there is ambiguity. The argument fails because whether the fourth priority would be

---

[7] Appellants concede that the provisions of the Credit Documents ought to be read together. (Tr. 54:24–55:11 ("It
has to make sense across the documents. It can't just make sense in one place.")).

redundant or not, it is clear that no matter what, Appellants would not be the payees under the

fourth priority. Thus, I do not need to decide how exactly the fourth priority operates other than

to say that, however it operates, the payees if any would be Deposit L/C Issuers. Thus, I do not

decide whether it does nothing that the first three priorities do not already do. I do not decide

whether Appellees' theory that it serves to distribute contingent Deposit L/C Obligations

(presently undrawn issued deposit letters of credit that are drawn in the future) is the function.[8]

Because Deposit L/C Obligations are clearly owed only to Deposit L/C Lenders, all of

Appellants' other arguments fail.

### 3. Obligations

The Credit Agreement defines "Obligations" as:

[A]ll advances to, and debts, liabilities, obligations, covenants and duties of, any
Credit Party arising under any Credit Document or otherwise with respect to any
Loan, Posting Advance or Letter of Credit or under any Secured Cash
Management Agreement, Secured Commodity Hedging Agreement or Secured
Hedging Agreement, in each case, entered into with US Holdings, the Borrower
or any Restricted Subsidiary, whether direct or indirect (including those acquired
by assumption), absolute or contingent, due or to become due, now existing or
hereafter arising and including interest and fees that accrue after the
commencement by or against any Credit Party of any proceeding under any
bankruptcy or insolvency law naming such Person as the debtor in such
proceeding, regardless of whether such interest and fees are allowed claims in
such proceeding. Without limiting the generality of the foregoing, the Obligations
of the Credit Parties under the Credit Documents (and any of their Restricted
Subsidiaries to the extent they have obligations under the Credit Documents)
include the obligation (including guarantee obligations) to pay principal, interest,
charges, expenses, fees, attorney costs, indemnities and other amounts payable by
any Credit Party under any Credit Document.

(Credit Agreement § 1.1).

Appellants argue that it should be implied that the term Deposit L/C Obligations naturally

encompasses amounts owed to the Deposit L/C Lenders because of the Deposit L/C Loans that

---

[8] Although, I suspect that it is a less than optimally-drafted way of doing so.

21

they advanced. Appellants suggest that the dictionary definition of "Obligation" means "a formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract." (D.I. 15 at 34). Appellants argue that section 1.1 of the Credit Agreement defines Obligation to be amounts owing in respect of all Loans, including the amounts owed to the lenders who made those Loans. It follows, Appellants argue, that the more specific term Deposit L/C Obligations must refer to amounts owing in respect of the more specific Deposit L/C Loans, including amounts owed to the Deposit L/C Lenders in connection with the Deposit L/C Loans. (D.I. 15 at 34–35).

Appellees argue that the Credit Agreement uses the definitions, "Obligations, "Credit Agreement Obligations," and "Secured Obligations," in a way such that they ensure that certain basic elements of the loans are incorporated into TCEH's repayment obligation. They argue that the definition of Deposit L/C Obligations includes no references to lender repayment obligations of any kind, and no broad language ensuring that all possible components of loans are encompassed by the definition. Thus, they reason that the term Deposit L/C Obligations reflects only the total exposure the Deposit L/C Issuers face at any given time, not the exposure of Deposit L/C Lenders. (D.I. 17 at pp. 28–29). The Bankruptcy Court essentially agreed with the Appellees' argument. (D.I. 16 at A1308–12).

I too agree with Appellees' reading, in light of the discussion above in Part III.C.2.

#### 4.  Section 3.1(e) of the Intercreditor Agreement

Section 3.1(e) of the Intercreditor Agreement provides:

Following notice of any Event of Default received pursuant to Section 5.4, any Secured Debt Representative may request in writing that the Collateral Agent pursue any lawful action in respect of the Collateral in accordance with the terms of the Security Documents. Upon any such written request, the Collateral Agent

shall seek the consent of the Required Secured Parties to pursue such action (it being understood that the Collateral Agent shall not be required to advise the Required Secured Parties to pursue any such action). Following receipt of any notice that a (sic) Event of Default has occurred, the Collateral Agent may await direction from the Required Secured Parties and will act, or decline to act, as directed by the Required Secured Parties, in the exercise and enforcement of the Collateral Agent's interests, rights, powers and remedies in respect of the Collateral or under the Security Documents or applicable law and, following the initiation of such exercise of remedies, the Collateral Agent will act, or decline to act, with respect to the manner of such exercise of remedies as directed by the Required Secured Parties. Subsequent to the Collateral Agent receiving written notice that any Event of Default has occurred entitling the Collateral Agent to foreclose upon, collect or otherwise enforce the First Liens then, unless it has been directed to the contrary by the Required Secured Parties, the Collateral Agent in any event may (but will not be obligated to) take all lawful and commercially reasonable actions permitted under the Security Documents that it may deem necessary or advisable in its reasonable judgment to protect or preserve its interest in the Collateral and the interests, rights, powers and remedies granted or available to the Collateral Agent under, pursuant to or in connection with the Security Documents.

Notwithstanding anything to the contrary contained herein, nothing contained herein shall be construed to impair the rights of any of the Collateral Agent or the Deposit Letter of Credit Issuer to exercise their rights and remedies in respect of Deposit L/C Collateral, and each of the parties hereto acknowledges and agrees that the Lien and rights of any of the Collateral Agent or the Deposit Letter of Credit Issuer, to and under Deposit L/C Collateral shall be solely for the benefit of the specific beneficiaries thereof. With respect to the Deposit L/C Loan Collateral, references in this Agreement to Required Secured Parties shall be deemed references to the Required Deposit L/C Loan Lenders until proceeds from the Deposit L/C Loan Collateral have been applied pursuant to Section 4.1(b) to satisfaction of all priorities except "last".

(Intercreditor Agreement § 3.1(e)).

Appellants note that section 3.1(e) of the Intercreditor Agreement requires the prior written consent of the Deposit L/C Lenders for the fourth level of the Section 4.1(b) Waterfall to be amended. Appellants argue that it would be unusual to allow the Deposit L/C Lenders the right to veto amendment of a contract provision from which they receive no benefit. Thus, in Appellants' view, section 3.1(e) supports their interpretation that the Deposit L/C Lenders are the payees of the fourth level of the Section 4.1(b) Waterfall. The veto provision indicates some

23

particular interest that the Deposit L/C Lenders have in the relevant provision of the Section 4.1(b) Waterfall. (D.I. 15 at 39-40).

Appellees argue that section 3.1(e) does not create any priority right in the Deposit L/C Collateral Account. They argue that section 3.1(e) may have been inserted at the insistence of Deposit L/C Lenders to ensure that non-Deposit L/C Lenders could not outvote them to divert the funds elsewhere, exposing Deposit L/C Lenders to claims from Deposit L/C Issuers for additional credit support. (D.I. 17 at pp. 38-39). Appellees further point out there is nothing in section 3.1(e) addressing payment priorities; section 3.1 in general, and section 3.1(e) in particular, are about liens. (*See* Tr. 71:7-23). The Bankruptcy Court agreed with the Appellees' argument. (D.I. 16 at A1314).

I reject Appellants' arguments. Even assuming that it did provide Deposit L/C Lenders with a "right to veto," there is no language here that provides Deposit L/C Lenders a priority right to undrawn issued deposit letters of credit, whereas there is clear language in section 3.9 of the Credit Agreement as Amended that indicates that Deposit L.C Lenders do not have such a right.

## 5. Section 5.2(d) of the Credit Agreement

Section 5.2(d) of the Credit Agreement provides:

(d) Application to Term Loans, Deposit L/C Loans and Incremental Deposit L/C Loans. With respect to each prepayment of Term Loans, Deposit L/C Loans and Incremental Deposit L/C Loans elected to be made by the Borrower pursuant to Section 5.1 or, in the case of the Term Loans only, required by Sections 5.2(a)(i) and (ii), the Borrower may designate the Types of Loans that are to be prepaid and the specific Borrowing(s) pursuant to which made; provided that (x) the Borrower pays any amounts, if any, required to be paid pursuant to Section 2.11 with respect to prepayments of LIBOR Loans made on any date other than the last day of the applicable Interest Period and (y) no prepayment made pursuant to Section 5.1 or Section 5.2(a)(i) and (a)(ii) of Delayed Draw Term Loans shall be applied to the Delayed Draw Term Loans of any Defaulting Lender. In the absence of a Rejection Notice or a designation by the Borrower as described in

24

the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11. Upon any prepayment of Deposit L/C Loans, the Deposit Letter of Credit Commitment shall be reduced by an amount equal to such prepayment and the Borrower shall be permitted to withdraw an amount up to the amount of such prepayment from the Deposit L/C Loan Collateral Account to complete such prepayment; provided that after giving effect to such withdrawal, the Deposit Letters of Credit Outstanding at such time would not exceed the Deposit L/C Loan Collateral Account Balance.

(Credit Agreement § 5.2(d)).

Appellants argue that this provision permits TCEH, under certain circumstances, to withdraw amounts in the Deposit L/C Collateral Account to pay down the amounts owing to Appellants and other Deposit L/C Lenders (and only to pay down those amounts). They argue this supports their interpretation because it would be unusual for a credit agreement to permit segregated funds to be used to pay one subset of lenders, and not another subset of lenders, unless the first subset of lenders were being afforded a priority right to those funds. (D.I. 15 at 41). The Bankruptcy Court simply read 5.2(d) as an affirmative statement that even in the case of a voluntary repayment, the funds in the Deposit L/C Collateral Account would never be less than the outstanding Deposit Letters of Credit. The Bankruptcy Court saw 5.2(d) as an attempt to protect Deposit L/C Issuers by making sure that deposit letters of credit are always fully collateralized. (D.I. 16 at A1317).

I adopt the Bankruptcy Court's reading and reject Appellants' in light of the discussion above in Part III.C.2.

## 6. Section 2.1 of the Intercreditor Agreement

Section 2 of the Intercreditor Agreement is entitled "Lien Priorities." Section 2.1 provides:

Pari Passu. As among the Secured Parties, all Liens on the Collateral shall rank pari passu, no Secured Party shall be entitled to any preferences or priority over

25

> any other Secured Party with respect to the Collateral (except as otherwise
> provided in Section 4.1) and the Secured Parties shall share in the Collateral and
> all Proceeds thereof in accordance with the terms of this Agreement.

(Intercreditor Agreement § 2.1).

Appellees argue that section 2.1 of the Intercreditor Agreement manifests the parties'

intent to provide equal treatment among all TCEH First Lien Lenders. (D.I. 17 at pp. 24–25).

Appellants argue that (1) there is a clear exception to equal treatment for the section 4.1(b)

provisions, and (2) section 2.1 deals with lien priority and not payment priority. (*See* Tr. 51:16–

53:9). The Bankruptcy Court agreed with Appellees' argument. (D.I. 16 at A1306). Even if

Appellants' arguments were correct, they would in no way impact my discussion of the fourth

priority of the Section 4.1(b) Waterfall in Part III.C.2.

### 7.  Section 2.14(d) of the Credit Agreement

Section 2.14(d) of the Credit Agreement provides:

> The Incremental Deposit L/C Loans (i) shall rank pari passu in right of payment
> and of security with the Revolving Credit Loans, the Initial Term Loans, the
> Delayed Draw Term Loans, the Posting Advances and the Deposit L/C Loans, (ii)
> shall not mature earlier than the Deposit L/C Loan Maturity Date, (iii) shall have
> interest rates and amortization schedules determined by the Borrower and the
> lenders thereof and (iv) may have terms and conditions different from those of the
> Deposit L/C Loans; provided that, except with respect to the differences set forth
> in clauses (ii) and (iii) above, any differences must be reasonably acceptable to
> the Administrative Agent.

(Credit Agreement § 2.14(d)).

Appellees argue that section 2.14(d) of the Credit Agreement requires that any

Incremental Deposit L/C Loans (i.e., additional Deposit L/C Loans requested by TCEH after the

Closing Date) rank *pari passu* in right of payment and security with all previously issued debt

under the Credit Agreement, including the term loans, revolving loans, and Deposit L/C Loans.

They argue that section 2.14(d) would make no sense, or at best would be incomplete, if

26

Appellants had the priority they claim.  They argue (a) it would be impossible for Incremental

Deposit L/C Loans simultaneously to rank *pari passu* with the term loans and other non-Deposit

L/C Loans identified in section 2.14(d) *and* with the Deposit L/C Loans, if the Deposit L/C

Loans themselves did not rank equally with the non-Deposit L/C Loans, and (b) the provision

contains no carve-out or exception for Deposit L/C Collateral.  (D.I. 17 at p. 25).  The

Bankruptcy Court's position is similar.  (D.I. 16 at A1313).

 I agree with Appellees' reading, in light of the discussion above in Part III.C.2.

### 8.  Section 2 of the Security Agreement

Section 2(a) of the Security Agreement provides:

"Each Grantor hereby bargains, sells, conveys, assigns, sets over, mortgages, pledges, hypothecates and transfers to the Collateral Agent, for the benefit of the First Lien Secured Parties, and grants to the Collateral Agent, for the benefit of the First Lien Secured Parties and confirms its prior grant to the Collateral Agent for the benefit of the Secured Parties of, a lien on and security interest in (the "Security Interest"), all of its right, title and interest in, to and under all of the following property now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the First Lien Obligations: . . . (xii) the Deposit L/C Loan Collateral Account; . . . provided, that notwithstanding anything to the contrary in this Agreement (x) the Collateral shall exclude (A) Excluded Stock and Stock Equivalents or any other Stock or Stock Equivalents of any Person pledged (or specifically excluded from the pledge) pursuant to the Pledge Agreement, (B) Excluded Property, (C) motor vehicles and other assets subject to certificates of title, (D) Letter-of Credit Rights, (E) Commercial Tort Claims, (F) Excluded Lease Rights, (G) assets specifically requiring perfection through control agreements (other than the Deposit L/C Loan Collateral Account), (H) property or assets subject to capital leases and purchase money obligations to the extent subject to a Lien, in each case permitted by the Credit Agreement and by each Additional First Lien Agreement, and the terms of the Indebtedness secured by such Lien prohibit assignment of, or granting of a security interest in, such Grantor's rights and interests therein (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law), provided, that immediately upon the repayment of all Indebtedness secured by such Lien, such Grantor shall

be deemed to have granted a Security Interest in all the rights and interests with respect to such property or assets, and (I) any assets as to which the Collateral Agent and the Company have determined that the costs or other consequences (including adverse tax consequences) of providing a security interest in is excessive in view of the benefits to be gained thereby by the Lenders and (y) none of the items included in clauses (i) through (xiv) above shall constitute Collateral to the extent (and only to the extent) that the grant of the Security Interest therein would violate any Requirement of Law applicable to such Collateral.

(Security Agreement § 2(a)).

Appellees argue that section 2 of the Security Agreement provides that the Deposit L/C Collateral Account is part of the shared collateral for all First Lien Secured Parties, a defined term that includes both Deposit L/C Lenders and term loan lenders. They argue that if Appellants were right that Deposit L/C Lenders enjoy a higher payment priority in that account, the Security Agreement would have included language elevating their interest in that account over the other Secured Parties' interests in it, which it does not. (*Id.*).

I agree with Appellees' reading, in light of the discussion above in Part III.C.2.

### 9. Revolving Letter of Credit Facility

"Revolving L/C Borrowing" of the Credit Agreement is defined as: "an extension of credit resulting from a drawing under any Revolving Letter of Credit which has not been reimbursed on the date when made or refinanced as a Borrowing." (Credit Agreement § 1.1). "Revolving L/C Obligations" of the Credit Agreement is defined as:

[A]t any date of determination, the aggregate Stated Amount of all outstanding Revolving Letters of Credit plus the aggregate principal amount of all Unpaid Drawings under all Revolving Letters of Credit, including all Revolving L/C Borrowings. For all purposes of this Agreement, if on any date of determination a Revolving Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Revolving Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

(*Id.*).

Appellees argue that the Revolving Letter of Credit facility parallels the Deposit L/C Facility in every way except one: Revolving L/C Obligations specifically include Obligations owed to lenders, while Deposit L/C Obligations do not. (D.I. 17 at pp. 29–30). This suggests that because Deposit L/C Obligations does not specifically refer to lenders, that this was intentional. I agree with Appellees' reading, in light of the discussion above in Part III.C.2.

Having considered all of the material provisions of the Credit Documents, there is no payment priority to the Deposit L/C Lenders. Particularly in light of language in section 3.9 of the Credit Agreement as Amended and the fact that Appellants claim priority to an odd portion of the Deposit L/C Collateral Account, the undrawn issued deposit letters of credit, I conclude that Appellees' interpretation provides "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *See Serdarevic*, 760 F. Supp. 2d at 329. The Credit Documents are drafted such that I think they are unambiguous. They do not provide Deposit L/C Lenders with payment priority. It was not error for the Bankruptcy Court to conclude that the language of the fourth priority was unambiguous.

## IV.    CONCLUSION

For the reasons set forth herein, the Bankruptcy Court's April 12, 2016 Order granting Lender Defendants' Motion to Dismiss Complaint and dismissing the adversary proceeding with prejudice is **AFFIRMED**.

An appropriate order will be entered.